UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BECKY L. BISHOP and
KEVIN E. BISHOP,

    Plaintiffs,

and

STATE FARM FIRE AND CASUALTY COMPANY,

    Intervenor-Plaintiff,

 v.                Case No. 16-C-1447

PETER BOSQUEZ,
TIM WILZ,
KEVIN STUDZINSKI,
JOHN MOCADLO,
SHANE BAZILE,
DEAN NOLAN,
MATT KOLTZ,
WE CARE ANIMAL HOSPITAL, and
SANDRA FINGER,

    Defendants,

and

ZURICH AMERICA INSURANCE COMPANY,

    Intervenor-Defendant.

## DECISION AND ORDER

  Plaintiffs Becky L. Bishop and Kevin E. Bishop, who are currently representing themselves, filed the instant civil rights action related to the events surrounding the seizure of their horses. In particular, Plaintiffs asserts that various Waupaca County Sheriff's Department and Shawano County

Sheriff's Department officers violated their constitutional rights by using excessive force during the illegal search and seizure of their horses under 42 U.S.C. § 1983, and violated state law. They also maintain that Dr. Matt Koltz of We Care Animal Hospital violated their constitutional rights under § 1983 and assert various state law claims against Dr. Koltz and Dean Nolan, the horses' care giver. State Farm Fire and Casualty Company and Zurich America Insurance Company intervened in this action and seek a declaration that Plaintiffs' claims against Dr. Koltz for wrongful seizure of the horses, improper billing, false swearing and perjury would not be covered under Dr. Koltz' policies. Arising under federal law, the § 1983 claims provide this court with jurisdiction under 28 U.S.C. § 1331. The court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

Currently pending before the court are five motions for summary judgment filed by the defendants, the intervenor-plaintiff, and the intervenor-defendant. For the following reasons, the officers' motion for summary judgment will be granted-in-part, and Koltz and We Care Animal Hospital's motion will be granted with respect to the federal claims. The court will dismiss Plaintiffs' state claims without prejudice, as they are unrelated to the remaining federal claims and may be pursued in state court. Accordingly, the motions for summary judgment filed by Nolan, State Farm, and Zurich will be denied as moot.

**BACKGROUND**

The following facts are primarily taken from the officers' proposed findings of fact. Officers' Proposed Findings of Fact (OPFOF), ECF No. 106. Waupaca County Sheriff's Office Humane Officer Peter Bosquez arrived at property owned by Becky Bishop on July 30, 2013, after receiving reports of a malnourished horse. Bosquez investigated the property and observed several horses

2

appearing to be malnourished and injured, fencing in a state of disrepair, and defects in the barn enclosure and floor. Waupaca County Detective Sergeant Karski and Janette Newell from the office of the Wauapca County Corporation Counsel arrived at the residence at approximately 1:30 p.m. and toured the premises with Ms. Bishop. Ms. Bishop assured them that she would seek veterinarian care for her horses and repair the fencing and barn stalls.

On August 13, 2013, Bosquez returned to Ms. Bishop's property to determine whether Ms. Bishop followed through with her assurances. Bosquez noticed that while some horses appeared to be in better condition, other horses appeared malnourished and the fence and barn remained in a state of disrepair. Ms. Bishop indicated she had not yet contacted a veterinarian. Bosquez visited the property on September 4, 2013. A majority of the horses appeared to be in better health, but some continued to appear malnourished and underweight, the fence and stalls had not been fixed, and Ms. Bishop had not sought veterinary care. On September 28, 2013, Bosquez found that the fence and barn stalls remained in a state of disrepair.

Based on Ms. Bishop's failure to provide better treatment for the horses and attempt to repair her property, Bosquez served an Abatement Order on Ms. Bishop under Wis. Stat. § 173.11 and Waupaca County Ordinance Chapter 12, Section 18 on September 29, 2013. The Order required that Ms. Bishop return her property to a state of repair and seek veterinarian care for the horse herd. Ms. Bishop subsequently requested a hearing before the Waupaca County Legislative, Judicial, Ethics, Safety, and Security Committee. At the October 22, 2013 hearing, Ms. Bishop consented to the terms of the Abatement Order, and the Committee unanimously voted to uphold the Order. On October 27, 2013, Bosquez observed that Ms. Bishop's fence was not repaired and was held together with twine. He then sought a search warrant to search the property with a

veterinarian and to seize any malnourished horses. He obtained a search warrant on October 29, 2013, which required the assistance of a doctor of veterinary medicine. OPFOF ¶ 19; Koltz' Proposed Findings of Fact (KPFOF) ¶ 6, ECF No. 85. The County hired We Care Animal Hospital to assess the horses' condition on October 30, 2013 and to provide follow-up veterinary care as needed. KPFOF ¶ 9.

Bosquez, Waupaca County Sheriff's Office Sergeant Kevin Studzinski, Sergeant Tim Wilz, and Detective Sergeant Rob Karski arrived at Ms. Bishop's property with the search warrant on October 30, 2013. OPFOF ¶ 20. The officers served Ms. Bishop with the warrant at the front door of her residence and asked if there were any other occupants in the house. Ms. Bishop responded that her son, Eric, was sleeping in the house, and then closed and locked the front door and retreated into the house. Ms. Bishop maintains that she locked the door while she went to wake her son for her dogs' safety. After she locked the door, the officers began yelling instructions through the door. They directed her to open the door and to go get her son. She claims that she became confused by the officers' "contradictory" directives and stood at the door while they continued to yell. Pls.' Resp. to OPFOF ¶ 22, ECF No. 143. The officers believed that she was refusing to allow them into the house, as authorized by the search warrant, and breached the door to gain entry. OPFOF ¶ 24.

Once inside, Bosquez used a control technique to prevent Ms. Bishop from fleeing by grasping Ms. Bishop's left wrist with his left hand and holding Ms. Bishop's left tricep with his right. Karski then grasped Ms. Bishop's right arm, and the two officers escorted Ms. Bishop to the living room. The officers also escorted Eric to the living room and allowed Ms. Bishop to call her son, Kevin Bishop. The officers stationed outside the residence were informed that Mr. Bishop was en route to the property.

4

Waupaca County Sheriff's Office Sergeant Gene Goode, who is not named as a defendant in this matter, was one of the officers assigned to guard the perimeter of the property, to keep unauthorized individuals away from the property, and to safeguard the sheriff's office and veterinary staff during the search. His unmarked squad car was positioned approximately two car lengths into the Bishop driveway from Highway 45, on the grass adjacent to the gravel roadway. At approximately 8:45 a.m., Sergeant Goode and Sergeant Mocadlo observed Mr. Bishop's vehicle approaching the driveway. The vehicle's turn signal indicated that Mr. Bishop intended to turn into the driveway where Goode and Mocadlo were standing shoulder-to-shoulder in the graveled portion of the roadway. Goode signaled for Mr. Bishop to stop the vehicle at the end of the driveway, but he did not stop. Instead, he drove off the graveled portion of the driveway to go around the officers, nearly striking them, and proceeded toward the residence. Based on Mr. Bishop's actions, Goode and Mocaldo concluded he intended to disrupt the search or harm those present for the execution of the search warrant. They ran after the vehicle, ordering it to stop.

Mr. Bishop eventually stopped, and Mocaldo opened the door and ordered him to exit. Mr. Bishop locked his hands on the steering wheel and refused to exit the vehicle, even though the officers made repeated requests for him to do so. Mocadlo took Mr. Bishop's hands off the steering wheel and escorted him out of the vehicle. Mr. Bishop actively resisted Mocadlo's attempt to remove him. Mocadlo advised Mr. Bishop that he was being arrested and ordered him to place his hands behind his back. Mr. Bishop refused to comply with this order and became combative. Mocadlo and Bazile lowered him to the ground while he continued to resist and struggled to escape. Goode removed his taser from his duty belt and alerted Mr. Bishop and the officers that a taser was

ready to be deployed. Mr. Bishop then became compliant, and the officers applied handcuffs and advised him that he was being placed under arrest for obstructing an officer.

Mr. Bishop disputes the officers' version of events. He maintains that he did not see any officers or a vehicle blocking part of the driveway when he arrived at his mother's residence. He contends that he simply pulled into the driveway and parked on the grass near the house, due to the amount of vehicles in the driveway. Pls.' Resp. to OPFOF ¶¶ 34, 38. Mr. Bishop asserts that he was never instructed to exit his vehicle and was otherwise complaint with the officers' orders. He claims Mocadlo yanked his door open before he had a chance to turn his vehicle off or unbuckle his seatbelt, then threw him to the ground. *Id.* ¶ 45. He asserts that the officers knew he was in pain because he was limping around in circles after he had been thrown to the ground, *id.* ¶ 54, though the officers maintain that he was never free to move around in front of the law enforcement officers after he was arrested and placed into a squad car. OPFOF ¶ 54. Kevin was later found guilty of disorderly conduct for his actions in Waupaca County Case No. 13-CM-366.

During Mr. Bishop's arrest, Ms. Bishop became visibly upset and began pacing in her living room. *Id.* ¶ 56. Studzinski ordered her to sit on the couch. Ms. Bishop refused to remain seated, and Studzinski placed his hand on her shoulder several times to direct her back to the couch. The individuals in the residence heard a commotion outside and Ms. Bishop began using abusive language toward the officers and punched Studzinski in the chest. Studzinski then secured Ms. Bishop's arms, turned her face to the couch, and applied handcuffs, while she actively resisted. Wilz helped stabilize Ms. Bishop while Studzinski applied the handcuffs. At some point during this process, Ms. Bishop's pants became unbuttoned and fell down. Studzinski assisted Ms. Bishop in hoisting her pants, placed her in a seated position on the couch, and obtained a blanket for her to place over her lap. Wilz and

6

Studsinzki then escorted Ms. Bishop to the squad car. She actively resisted their efforts to guide her to the car, and her pants fell down. After placing Ms. Bishop in the squad car, Wilz returned to the residence to observe Eric Bishop. A female law enforcement officer arrived at the scene to transport Ms. Bishop to the Waupaca County Jail.

Ms. Bishop disputes the officers' account. She claims she was not upset, did not pace around her living room, did not use verbally abusive language, and did not punch Studzinski in the chest. Although she maintains she sat on the couch like she was ordered to, she does not dispute that she stood up to watch the officers arrest Mr. Bishop. She claims that Wilz and Studzinski then held her upside down to handcuff her, officers pulled her pants and underwear down, and Wilz touched her "private area," leaving scrapes and bruises. Pls.' Resp. to OPFOF ¶¶ 69, 71, 73. Once she was handcuffed, the officers forced her to walk to the squad car across the gravel driveway barefoot while she tried to hold up her pants. Wilz then pulled her into the squad car by her hair and shoulder. *Id.* ¶ 71.

After Ms. Bishop was taken to the Waupaca County Jail, Bosquez and Bazile proceeded to search the property. They documented the condition of the property and Ms. Bishop's horses with the help of veterinarian Dr. Koltz. Dr. Koltz had never been to Ms. Bishop's property before and examined her horses for the first time on October 30, 2013. KPFOF ¶ 7. He assessed the condition of the horses and provided body condition scores for each one. OPFOF ¶ 80. Bosquez and Bazile decided to seize 22 horses with deteriorating health. Bazile then telephoned Dean Nolan and requested that he remove the seized horses from Ms. Bishop's property and provide them with care. The seized horses were loaded onto a trailer for transport to the Nolan property by approximately

7

12:30 p.m. The officers filed the search warrant return with the Waupaca County Clerk of Court on November 1, 2013.

Ms. Bishop petitioned the Waupaca County Circuit Court for the return of her horses. Throughout 2013 and 2014, the Waupaca County Circuit Court found that the seizure of the horses was appropriate and that the search warrant was validly obtained. Ms. Bishop pled guilty to three counts of failing to provide adequate shelter for the horses, on June 30, 2014, and she was sentenced to two years probation on August 6, 2014. Ms. Bishop's horses have now been returned to her property.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the burden of showing there are no facts to support the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "Material" means that the factual dispute must be outcome-determinative under the law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary

8

judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

### A. Officers' Motion for Summary Judgment

Plaintiffs raise a number of federal and state claims against the officers. The court will address each claim in turn.

### 1. Excessive Force

Plaintiffs claim they were subjected to excessive force during the execution of the search warrant. A claim that police officers have used excessive force "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The inquiry required to assess an excessive force claim involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations omitted). The court's analysis of the objective reasonableness of an officer's actions must be "judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Id.* In excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

9

evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Finally, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

Ms. Bishop asserts that the officers used excessive force when Wilz shoved her into the wall of her home multiple times, Studzinski forcibly shoved her onto the couch multiple times, Wilz and Studzinski held her upside down, the officers refused to let her pull up her pants and underwear after they fell down, Wilz touched her genitals, and Wilz pulled her into the squad car by her hair. The officers deny that Wilz or Studzinski pulled down Ms. Bishop's pants or touched her genitals and assert the officers only used reasonable force as was necessary given the situation. For instance, the officers maintain that Studzinski placed his hand on Ms. Bishop's shoulder to direct her back to the couch where he asked her to sit, turned her to face the couch to apply handcuffs after she began using abusive language and punched him in the chest, and helped hoist Ms. Bishop's pants up after they fell. And Wilz helped stabilize Ms. Bishop while Studzinski applied the handcuffs and escorted Ms. Bishop to the squad car with Studzinski. The officers' attempt to characterize the facts in a way that would suggest the force used on Ms. Bishop was reasonable creates an issue of fact regarding the amount and type of force used by the officers as well as Ms. Bishop's combativeness. Without resolving these factual disputes, the court cannot conclude, as a matter of law, that the officers' conduct with respect to Ms. Bishop was objectively reasonable.

Mr. Bishop asserts that Mocadlo used excessive force when he "yanked" Mr. Bishop from his vehicle and threw him to the ground, without provocation, before he had a chance to turn his vehicle off and unbuckle his seatbelt. The officers argue that Mr. Bishop's excessive force claim

10

challenges the validity of his conviction for disorderly conduct and must be dismissed pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994). "*Heck* bars any suit for damages premised on a violation of civil rights if the basis for the suit is inconsistent with or would undermine the constitutionality of a conviction or sentence." *Wiley v. City of Chicago*, 361 F.3d 994, 996 (7th Cir. 2004) (citing *Heck*, 512 U.S. at 486–87). While a plaintiff who has been convicted of resisting arrest is not *Heck*-barred from maintaining an excessive force claim per se, a plaintiff may only proceed with such a claim "to the extent that the facts underlying the excessive force claim are not inconsistent with the essential facts supporting the conviction." *Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014) (citing *Evans v. Poskon*, 603 F.3d 362, 363 (7th Cir. 2010)).

In this case, Mr. Bishop's excessive force claim is not *Heck*-barred because his assertion that he did not ignore the officers' orders and that the officers used excessive force to effect his arrest is not necessarily inconsistent with the disorderly conduct conviction, which a person violates if he "engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance." Wis. Stat. § 947.01. Even if Mr. Bishop's conduct was indecent or disorderly, a dispute of fact exists as to whether Mocadlo's use of force went beyond what is reasonable under the Fourth Amendment. Construing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Mocadlo used excessive force to effect Mr. Bishop's arrest when he removed Mr. Bishop from his vehicle and threw him to the ground. *See Hardrick v. City of Bolingbrook*, 522 F.3d 758, 764 (7th Cir. 2008) ("The fact that Hardrick 'struggled while being handcuffed' at one point in time does not preclude the possibility that at another point in time, Hardrick was 'peaceably waiting to be handcuffed.' Whether a fact-finder would find this scenario plausible is not for us to

11

conclude, but in terms of *Heck*, it is not one that necessarily implies the validity of the conviction, and does not bar Hardrick's excessive force claim." (internal quotation marks omitted)). Therefore, Mocadlo is not entitled to summary judgment as a matter of law on Mr. Bishop's excessive force claim.

Finally, Wilz, Studzinski, and Mocadlo assert they are entitled to qualified immunity. The doctrine of qualified immunity shields government officials from civil liability insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Although qualified immunity is a defense to a § 1983 suit, the burden of meeting the elements of this two-part test rests on the plaintiff." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). In order to overcome a defense of qualified immunity, the plaintiff must point to "'a clearly analogous case establishing a right to be free from the specific conduct at issue'" or show "that 'the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)).

Even though Plaintiffs did not respond to the officers' qualified immunity argument or point to any cases that find a violation of constitutional rights under analogous circumstances, if the jury credits Plaintiffs' version of the facts, the force used by the officers would clearly violate their Fourth Amendment rights. *See Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008) ("[I]t is clear that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever."); *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) ("Officer Pauley's force in arresting a women who was not threatening to harm the police officer or anyone

12

else at the scene, was not resisting or evading arrest, was not attempting to flee, and was charged with such minor offences, was not objectively reasonable."). "When the qualified immunity inquiry cannot be disentangled from the disputed facts, the issue cannot be resolved without a trial." *Gonzalez*, 578 F.3d at 540 (citing *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)). Because the qualified immunity analysis is not sufficiently separable from the merits of the case, the officers are not entitled to qualified immunity at this time.

**2. Validity of the Search and Seizure**

Plaintiffs also challenge the validity of the search and seizure. "The removal of an animal constitutes a 'seizure' for purposes of the Fourth Amendment, and thus such a seizure must meet that Amendment's constitutional requirements." *Siebert v. Severino*, 256 F.3d 648, 656 (7th Cir. 2001) (citation omitted). A search performed pursuant to a valid search warrant, and the affidavit supporting the warrant, are presumptively valid. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)); *Easterling v. Moeller*, 418 F. App'x 495, 497 (7th Cir. 2011). "A warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (citation omitted).

Although Plaintiffs assert that Bosquez made false statements and failed to follow the proper procedure to obtain the search warrant, they have not presented evidence to substantiate these claims. Bosquez' affidavit, which was submitted in support of his application for the search warrant, summarized his four-month investigation into the condition of Ms. Bishop's property and horses and noted that Ms. Bishop had neither made efforts return her property to a state of repair nor sought

13

veterinary care for the horse herd. ECF No. 108-3. In short, Plaintiffs have not rebutted the presumptive validity of Bosquez' search-warrant affidavit. *See United States v. Hester*, 552 F. App'x 580, 583 (7th Cir. 2014) (finding "conclusory allegations about the falsification of the search-warrant affidavit" are insufficient to establish the invalidity of the affidavit). Accordingly, Plaintiffs' challenge to the validity of the search and seizure fails.

To the extent Plaintiffs assert a due process violation, that claim fails as well. Procedural due process requires a two-step analysis. "First, we consider whether the plaintiff was deprived of a constitutionally protected interest in life, liberty, or property. If he was, we then determine what process he was due with respect to that deprivation." *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996) (citation omitted). The officers do not dispute that Plaintiffs' ownership interest in their horses is a protected property interest under the Fourteenth Amendment. *See id.* Under the Fourteenth Amendment, a person should "not be deprived of [his protected interest] without notice and an opportunity for a hearing." *Siebert v. Severino*, 256 F.3d 648, 659 (7th Cir. 2001) (citation omitted). In this case, Waupaca County satisfied the pre-deprivation hearing requirement of the Fourteenth Amendment by issuing Ms. Bishop an Abatement Order on September 29, 2013 and permitting Ms. Bishop to appear at a hearing before the Waupaca County Legislative, Judicial, Ethics, Safety, and Security Committee on October 22, 2013, to challenge the Order. At the hearing, Ms. Bishop consented to the terms of the Abatement Order, and the Committee affirmed its contents. When Ms. Bishop failed to repair her property and seek veterinary care, the Waupaca County Circuit Court subsequently issued a search warrant on October 30, 2013. Ms. Bishop subsequently sought review of the seizure in Waupaca County Circuit Court. In short, Plaintiffs' procedural due process rights were not violated.

14

**3. State Law Claims**

Plaintiffs' remaining state law claims against the officers, including Plaintiffs' assertion that Finger refused to allow Ms. Bishop's veterinarian to examine her horses and that Bosquez and Bazile failed to properly monitor the care of her horses, are wholly unrelated to the excessive force claims. The court therefore declines to exercise supplemental jurisdiction over these claims. Plaintiffs' state law claims will be dismissed without prejudice so that they may be pursued in a state forum.

**B. Dr. Koltz and the Intervenor-Defendants' Motions for Summary Judgment**

Plaintiffs assert claims under § 1983 and Wisconsin state law against defendants We Care Animal Hospital and Dr. Koltz. To succeed on their § 1983 claim, Plaintiffs must prove "(1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under color of state law." *Wilson v. Warren Cty., Ill.*, 830 F.3d 464, 468 (7th Cir. 2016) (citation omitted). A private individual acts under color of state law when he is a "willful participant in joint action with the State or its agents." *L.P. v. Marian Catholic High School*, 852 F.3d 690, 696 (7th Cir. 2017). The plaintiff must demonstrate that "both public and private actors share a common, unconstitutional goal." *Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991).

In this case, Plaintiffs have not presented evidence supporting an inference that Dr. Koltz and the officers shared an unconstitutional goal. Plaintiffs assert that Dr. Koltz' medical assessment of Ms. Bishop's horses influenced the officers' decision to seize them. But "the mere furnishing of information by a private party to a law enforcement official . . . is not sufficient to constitute joint activity with State officials in prohibited action or to state a claim against a private party under § 1983." *Holdeman v. Consolidated Rail Corp.*, 649 F. Supp. 1188, 1196 (N.D. Ind. 1986); *see*

*also Rangel v. Reynolds*, 607 F. Supp. 2d 911, 927 (N.D. Ind. 2009) ("[A] physician and a pediatric center were not state actors even when they contracted with the state and received compensation in return for reporting their findings to the state's Department of Children and Family Services and testifying at criminal proceedings" (citing *Evans v. Torres*, No. 94 C 1078, 1996 WL 5319, at *7 (N.D. Ill. Jan. 4, 1996))); *Hatlee v. Olds*, 665 F. App'x 695, 698–99 (10th Cir. 2016) (holding that veterinarian, who urged police to remove horses from plaintiffs' ranch, did not act under color of state law because officers' decision to seize horses was independent of his influence). In addition, Dr. Koltz' assessment occurred after the officers had obtained a search warrant to search Ms. Bishop's property and to seize any malnourished horses. Plaintiffs have not established that Dr. Koltz and the officers conspired to violate Plaintiffs' constitutional rights or shared an unconstitutional goal in the first instance. Their § 1983 claims against Dr. Koltz will therefore be dismissed. The court will also grant summary judgment in favor of We Care Animal Hospital, because it is a private corporation that cannot be held vicariously liable under § 1983 by a respondeat superior theory. *See Shields v. Ill. Dept. of Corrs.*, 746 F.3d 782, 789 (7th Cir. 2014).

Plaintiffs have also alleged state law claims of veterinary malpractice, perjury, and improper billing against Dr. Koltz and We Care Animal Hospital. Generally, when federal claims drop out of a case, federal courts decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3); *see Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). The Seventh Circuit has described a "sensible presumption that if the federal claims drop out *before trial*, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d

904, 907 (7th Cir. 2007); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 502 (7th Cir. 1999) (noting that the rule is dismissal unless state claims are frivolous or a "no brainer"). Nothing in this case suggests that the presumption should be ignored. Accordingly, Plaintiffs' state claims against Dr. Koltz and We Care Animal Hospital will be dismissed without prejudice so that they may be pursued in a state forum.

State Farm and Zurich have intervened in this case and seek a declaration that Plaintiffs' claims against Dr. Koltz for wrongful seizure of the horses, improper billing, false swearing, and perjury would not be covered under Dr. Koltz' policies. Their motions for summary judgment on coverage will be denied as moot. Any remaining coverage issues may be presented in a state forum.

**C. Nolan's Motion for Summary Judgment**

Plaintiffs have alleged a state law claim of negligence against Nolan. This claim is entirely unrelated to the federal claims asserted against the officers. The court therefore declines to exercise supplemental jurisdiction over this state law claim, and it will be dismissed without prejudice so that it may be pursued in a state forum. Therefore, Nolan's motion for summary judgment will be denied as moot.

**CONCLUSION**

For the reasons set forth above, the Officers' motion for summary judgment (ECF No. 104) is **GRANTED-IN-PART** and **DENIED-IN-PART**. The motion is denied with respect to Plaintiffs' excessive force claims against Wilz, Studzinski, and Mocadlo but granted with respect to the remaining federal claims. Koltz and We Care Animal Hospital's motion for summary judgment (ECF No. 83) is **GRANTED** as to the federal claims, and such claims are dismissed. Plaintiffs' state law claims are dismissed without prejudice. Nolan's motion for summary judgment (ECF No. 99), State

17

Farm's motion for summary judgment (ECF No. 90), and Zurich's motion for summary judgment (ECF No. 94) are **DENIED as moot**. The Clerk is directed to set the matter on the court's calender for further scheduling.

    **SO ORDERED** this   29th   day of June, 2018.

                                            s/ William C. Griesbach
                                            William C. Griesbach, Chief Judge
                                            United States District Court